*Original*

530 New

**FILED**

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ISAAC SANDOVAL L.

FEB 25 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

    (Last)           (First)

Prisoner Number V-84557

Institutional Address P.O. BOX 5107 DELANO, CA 93216

**CW**

**(PR)**

==============================================================

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ISAAC SANDOVAL L.
_____
Full Name of Petitioner

**CV 08      1117**

Case No. _____
    (To be provided by the clerk of
    court)

      vs.

A. HEDGPETH, Warden
_____
Name of Respondent
(Warden or jailor)

PETITION FOR A WRIT OF HABEAS CORPUS

**E-filing**

==============================================================

<u>Read Comments Carefully Before Filling In</u>

<u>When and Where to File</u>

    You should file in the Northern District if you were convicted
and sentenced in one of these counties:  Alameda, Contra Costa, Del
Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito,
Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You
should also file in this district if you are challenging the manner in
which your sentence is being executed, such as loss of good time
credits, and you are confined in one of these counties.  Habeas L.R.
2254-3(a).

    If you are challenging your conviction or sentence and you were
<u>not</u> convicted and sentenced in one of the above-named fifteen
counties, your petition will likely be transferred to the United
States District Court for the district in which the state court that
convicted and sentenced you is located.  If you are challenging the
execution of your sentence and you are not in prison in one of these
counties, your petition will likely be transferred to the district
court for the district that includes the institution where you are
confined.  Habeas L.R. 2254-3(b).

C08-1117 CW

Who to Name as Respondent

You must name the person in whose actual custody you are.  This usually means the Warden or jailor.  Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced.  These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition?

(a)  Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Sacramento County Superior Court, Sacramento
Court                          Location

(b)  Case number, if known  03F08490 & 03F02411

(c)  Date and terms of sentence  75 yrs to life, plus 5 yrs

(d)  Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.)  Yes  X  No ____

Where? Kern Valley State Prison   P.O. Box 5107 Delano, CA 93216
(Name of Institution)                    (Address)

2.  For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known.  If you are challenging more than one sentence, you should file a different petition for each sentence.)

First degree murder (Pen. code 187) Discharge of a firearm (12022.53 (d); 12022.53 (d) Personal use of firearm (12022.5 (b)(i); 12022.53(b),(c),(d), and (e)(i); 186.22 (b)(i); 667(b)

3.  Did you have any of the following?

Arraignment:  Yes  X  No ____  Preliminary Hearing:  Yes  X  No ____

Motion to Suppress:  Yes  X  No ____

2

4.    How did you plead?

Guilty _____      Not Guilty  **X**      Nolo Contendere _____

Any other plea (specify) _____

5.    If you went to trial, what kind of trial did you have?

Jury **X**      Judge alone _____      Judge alone on a transcript _____

6.    Did you testify at your trial?    Yes _____   No  **X**

7.    Did you have an attorney at the following proceedings:

(a)  Arraignment      Yes  **X**   No _____
(b)  Preliminary hearing      Yes  **X**   No _____
(c)  Time of plea    Yes  **X**   No  **X**
(d)  Trial        Yes  **X**   No _____
(e)  Sentencing      Yes  **X**   No _____
(f)  Appeal    Yes  **X**   No _____
(g)  Other post-conviction proceeding    Yes _____   No  **X**

8.    Did you appeal your conviction?    . Yes  **X**   No _____

(a)  If you did, to what court(s) did you appeal?

**ExH.1)** Court of Appeal      Yes  **X**   No _____    2006 NOV AFFiRMed
                                              (Year)          (Result)

**ExH.2)** Supreme Court of California    Yes  **X**   No _____    2007 FEb    AFFiRMed
                                              (Year)          (Result)

Any other court      Yes _____   No _____    _____
                                              (Year)          (Result)

(b)  If you appealed, were the grounds the same as those that you are raising in this petition?  Yes  **X**   No _____

(c)  Was there an opinion?    Yes  **X**   No _____  (ExH.1-2)

(d)  Did you seek permission to file a late appeal under Rule 31(a)?    Yes _____   No  **X**

If you did, give the name of the court and the result:

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _____   No  **X**

3

Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. § 2244(b).

(a)  If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

I.  Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____  Date of Result _____

II.  Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____  Date of Result _____

III. Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?    Yes _____   No _____

_____
(Name and location of court)

B.  GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations. Attach extra paper if you need more space.  Answer the same questions for each claim.

    Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467; 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One:  (See Exhibit 1 pages 6 through 14)

Supporting Facts:  (See Attached Exhibit 1 pages 5 through 14)

Claim Two:  (See Attached Exhibit 1 pages 15 through 19)

Supporting Facts:  (See Attached Exhibit 1 pages 5 through 19)

5

Claim Three: (See Attached ExHibit 1 pAges 19 tHrougH 23)

Supporting Facts: (see AttAcHed ExHibit 1 pAges 5 tHrougH 23)

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

ClAim FouR And FiVE: (See AttAcHed ExHibit 1 pAges 24 tHrougH 29)

SuppoRting FActs: (see AttAcHed ExHibit 1 pg 5-29)

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Do you have an attorney for this petition?    Yes _____    No __X__
If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __2/7/08__          __ISAAC SANDOVAL__
                Date                        Signature of Petitioner

(rev. 5/96)

1

PROOF OF SERVICE BY UNITED STATES MAIL
(§§ 445, 1013a, 2015.5 C.C.P.)

2

3  STATE OF CALIFORNIA        )
                             )
4  COUNTY OF KERN            )

5

6      I, the undersigned, declare that I am a resident of the aforesaid

7  county, State of California; I am over the age of eighteen years and not

8  a party to the within action; My address is: P.O. BOX 5107

9  DELANO, CA 93216 - 5107

10

11     On the belowstated date I served documents described as follows:

12  28 U.S.C. 2254 WRIT OF HABEAS CORPUS PETITION

13  WITH EXHIBIT "A" AND "I'-'2", AN ORIGINAl

14

15

16  on the Interstate parties in this action by placing a true copy thereof,

17  enclosed in a sealed envelope with postage thereon fully prepaid, in the

18  United States mail at ~~Tehachapi,~~ California, addressed as follows:

19          U.S. DISTRICT COURT

20          NORTHERN DISTRICT

            450 GOlDEN GATE AVENUE

21          P.O. BOX 36060

22          SAN FRANCISCO, CA 94102

23  I declare under penalty of perjury that the foregoing is true and correct.

24

25  Dated this  7  day of

26  FEBRUARY, 19 2008                    _Isaac I. Sandoval_
                                        Signature of Declarent
27                                       ISAAC I. SANDOVAL
                                        Printed Name of Declarent

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

# EXHIBIT A

## STATEMENT OF CASE AND FACTS

For purposes of this petition, appellant adopts the factual and procedural background stated in the opinion at pages 1 through 8.

## ARGUMENT

### I.

### CALJIC No. 5.12 IS AN ERRONEOUS STATEMENT OF THE LAW OF SELF-DEFENSE BECAUSE IT ERRONEOUSLY INSTRUCTS THE JURY THAT A DEFENDANT MAY NOT FEEL ANY OTHER EMOTION THAN FEAR WHEN REACTING TO A THREAT OF IMMINENT HARM

Appellant contends that CALJIC No. 5.12 excludes the principle that a party killing may harbor other emotions than fear so long as it is fear that causes him to act. In a gang case, it is important for a jury to understand this principle because otherwise, a prosecutor can argue, as in this case, that the gang member's lifestyle and rivalry with other gangs will always preclude a successful claim of self-defense, reasonable or unreasonable.

CALJIC No. 5.12 states:

> To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and *the party killing must act under the influence of those fears alone*. (2CT 338; 2RT 517.)

Although the party killing must have acted under the influence of such fears alone, his mental state need not be one of only fear. (Pen. Code § 198; *People v. Trevino* (1988) 200 Cal.App.3d 847, 879 [defendant's anger or other emotions do not preclude defense, but emotions other than fear cannot be causal factors in decision to use deadly force].) "The justification of self-defense requires a double showing: that the defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person." (*People v. Sonier* (1952) 113 Cal.App.2d 277, 278; see Witkin &

6

Epstein, Cal. Criminal Law, 3d ed., Defenses, §68, pp. 402-403.)[1]

In this case, the prosecutor's gang expert testified that appellant would expect the Sureño gang members to be armed and to confront him. He could fight or walk away but if he backed down, he could expect to be beaten or killed by either the Sureños or his own gang. (2RT 398, 374, 403.) Knowing that he was in mortal danger when he came into contact with Chupas and Ivan, after he was physically and verbally confronted by them, Ivan described appellant as "scared, agitated and panicked." (2CT 472.) Appellant reacted and shot Chupas before he could shoot him.

The test for determining whether a person acted in reasonable self-defense depends on the totality of the circumstances known to the killer at the time of the killing. (*People v. Humphrey* (1996) 13 Cal.4th 1073. 1082-1083.) *Humphrey* dealt with the relevance of the battered woman syndrome to the subjective component of self-defense. Since *Humphrey*, the cases have carefully distinguished between the "reasonable man standard" and resisted creating classes of certain "kinds of reasonable persons."

In *People v. Romero* (1999) 69 Cal.App.4th 846 the court rejected the claim that the defendant should be able to introduce expert testimony on

---

[1] CALCRIM No. 505, the Judicial Council's instruction on reasonable self-defense, does not word the principle in the statutory language:

> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to (himself/herself/ [or] someone else). Defendant's belief must have been reasonable and (he/she) *must have acted only because of that belief.* [Emphasis added.]

7

the subjective component to explain that due to his poverty and Hispanic heritage, he would be more fearful of the victim than the "normal" person in the same circumstances and feel a need to act to protect his younger brother. Similarly, in *People v. Jefferson* (2004) 119 Cal.App.4th 508 the court rejected the argument on appeal that the trial court should have instructed the jury to judge the defendant as a "reasonable mentally ill person." (Also see "Self-Defense," Grumer, J., Loyola of Los Angeles Law Review, Summer 2003, Vol. 36:1575.)

Appellant is not claiming that he was entitled to such an instruction. Rather, he is claiming that the prosecutor's argument amounted to the converse – that the defendant's gang lifestyle precluded him from claiming self-defense, reasonable or unreasonable, because there is no "reasonable gang member" standard.

Appellant's counsel did not object to the prosecutor's remarks; however, the nature of the remarks demonstrate no admonition would have cured the harm and repeatedly objecting to the remarks would only have exacerbated the harm.[2] As recently stated in *People v. Jablonski* (2006) 37 Cal.4th 774:

When a prosecutor's intemperate behavior is sufficiently

_____

[2] As in this case, defense counsel frequently choose to counter a prosecutor's objectionable closing argument by addressing it in their own closing argument rather than objecting to the improper remarks and highlighting the improper argument. Appellant claims that objecting and asking for an admonition would not have cured the error; however, if defense counsel should have objected and requested an admonition, he was ineffective for failing to do so and the issue should be reached on direct review to avoid any further necessity of pursuing this line of inquiry later. Alternatively, this petition for review should be treated as a petition for writ of habeas corpus.

8

egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah, supra*, 35 Cal.4th at p. 462.) As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and requested an admonition "unless an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159.) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah, supra*, at p. 462.) " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337.) (*Id.*, at 835.)

In this case, the prosecutor argued that, as a Norteño gang member, appellant killed Chupas simply because he wanted to kill a "scrap" (a Sureño gang member) and prepared to do so by arming himself. Therefore, appellant forfeited his right to defend himself, either reasonably or unreasonably, because the standard is "reasonableness" and there is no such thing as a "reasonable gang member." (See 2RT 432-433, 434 [defendant not acting in a 100 percent reactionary state of mind].)

While the *Humphrey* opinion does not "compel adoption of a 'reasonable gang member' standard," (13 Cal.4th at 1087), the prosecutor's closing argument went way beyond that statement when it asked the

9

community not to sanction gang shootouts at the AM/PM. ["And what we as a community are not prepared to ever do is sanction gang shootouts at the AM/PM mini market. That's why we having 12 people in this box, because what we're looking for is a community standard; not just a rote application of a fact to the law, but we're asking you how do reasonable people react? As a community, how do we expect reasonable people to act?" (2RT 438-439); "reasonableness of conduct is a community standard" (2RT 466-467, 492, 498); "we as a community do not accept the gang shootout at the AM/PM" (2RT 489).]

The prosecutor argued that because the defendant has chosen the gang lifestyle, his knowledge that the rival gang will be armed is not relevant because he always expects his rivals to be armed. (2RT 440-441.) The prosecutor acknowledged that the "victims" were armed, started the challenge and the fight would not be fair.

> It's the difference between – legitimate self-defense is the difference between people who spend their life trying to avoid killing another human being and a person whose lifestyle is based on killing another human being. (2RT 442-443.)

> It's reactionary. It cannot be planned. It cannot be prepared for. You can't sit around and talk about how you're going to murder a Sureño, and then when the opportunity presents itself murder a Sureño and go, oh, self-defense. It doesn't work like that because the defendant was not acting under the influence of those fears alone. He had prepared. He had planned. (2RT 488.)

> We are involved – when we talk about reasonableness of conduct, this is, like I said, a community standard, and we as a community do not accept the gang shootout at the AM/PM. And that is why I said that when we hear these facts, our gut reaction right out of the shoot, is, oh, my goodness. That's a murder. (2RT 489.)

10

The prosecutor pressed his theme in closing argument: "The reasonable person standard is not the reasonable gang member standard. It is a community standard that we set. We do not look at these cases from the viewpoint of a hardened gangster. We look at these cases from, and these issues from, the perspective of a reasonable person." (2RT 492.) The prosecutor also argued that the same goes for voluntary manslaughter because the defendant cannot set up his own standard of conduct to justify or excuse himself because his passions were aroused under the circumstances in which the defendant was placed. (2RT 493.)

The court of appeal found nothing wrong with any of the prosecutor's closing argument. (Opn., pp. 20, 22, 23.) To carry the prosecutor's argument to its logical conclusion, no one could ever claim reasonable self-defense if he carried a gun for protection in a dangerous neighborhood because by being prepared, he would have "planned" to defend himself by killing his assailant but the court of appeal rejected this line of reasoning. (Opn., p. 23.)

The case of *People v. Lee Chuck* (1887) 74 Cal. 30 [15 P. 322] instructs that even gang members are entitled to act in self-defense. In that case, excluding evidence which explains that was reversible error.

Lee Chuck was charged with murder in the shooting of Yin Yuen. They were members of rival gangs. Lee Chuck's defense was that he shot at Yin Yuen in self-defense, after the latter shot at him. The eyewitness testimony was conflicting. Lee Chuck was convicted of murder, and the judgment was reversed on appeal.

> It appeared from the evidence of the prosecution that, at the time of the homicide, Lee Chuck was incased in a steel coat-of-mail, and was armed with four pistols. These were brought in and displayed before the jury. They were intended

11

to have, and doubtless did have, great weight in convincing the jury that Lee Chuck had prepared himself for the deadly encounter in which Yin Yuen lost his life. To explain this fact, and to show that the defendant had reason to think his life in danger, and for that reason, and not to prepare himself to make a murderous assault upon the deceased, defendant put on a coat-of-mail and armed himself, the defense offered to show that the Bo Sin Sear society and another organization of which Yin Yuen was a member, had threatened to take the life of defendant, and that defendant had been informed of the fact. This evidence was objected to as incompetent, and the objection was sustained.

This ruling cannot be maintained. The fact of the extraordinary armor worn by the defendant at the time of the homicide was important evidence for the prosecution. To refuse to permit the defendant to show that the preparation was for a different purpose, and for reasons which implied no intent to assault the deceased, was a denial of a most essential right.' (*People v. Lee Chuck, supra*, 74 Cal. at pp. 34-35.) (See *People v. Minifie* (1996) 13 Cal.4th 1055 [holding evidence of threats from third party relevant to defendant's state of mind in claim of perfect self-defense]; also see Kadish, Excusing Crime (1987) 75 Cal.L.Rev. 257, 275; Comment (1937) 25 Cal.L.Rev. 459, 465.)

The prosecutor also argued that appellant could not be guilty of voluntary manslaughter based on heat of passion because the instruction says "what a reasonable person in our community would do" – not "what a reasonable gangster would do." (2RT 427.) "For the defendant to try and compare himself to that type of individual and say, look, my actions are reasonable too, would be offensive, ..." (2RT 429.)

As mentioned, the defense did not formally object to this line of argument; instead, in closing argument counsel talked to the jury about following the law as given to them by the judge that they "must not be

12

influenced by sentiment, conjecture, sympathy, passion, prejudice, public

opinion or public feeling. You're required to base your decision on whether

the state has proven their case beyond a reasonable doubt. It's proof... not

emotion. It's not a feeling. It's a gang case, but you can't convict Isaac

Sandoval of murder because he's a bad guy. That's not proof of murder."

(2RT 469-470.)

> Defense counsel accurately explained self-defense to the jury:

> "Isaac Sandoval was up at the AM/PM first, and the Sureños
> walked upon them. Did Isaac Sandoval say anything? No.
> The Sureños: Where you from? Franklon. Could the Sureños
> have de-escalated this? Sure. They didn't have to come up
> and face up and raise up on Mr. Sandoval. Mr. Sandoval,
> faced with that situation in the few moments that he had,
> could he have run? Sure, but he doesn't have to. He can
> stand his ground." (2RT 477.)

Defense counsel accurately told the jury that "seeking a quarrel" did

not apply because Sandoval didn't seek the quarrel. He was there at the

AM/PM minding his own business when the Sureños came upon him and

challenged. "And that's not contrived." (2RT 478.) As well, this was not a

mutual combat situation where they are fighting and someone says he wants

to stop. "This was a split second." (2RT 478.) When Chupas grabbed for

his gun, even if mutual combat were to apply, the sudden aggression on the

part of the Sureños allowed Mr. Sandoval to claim the self-defense. (2RT

478.) This principle is supported by case law. (*People v. Quach* (2004) 116

Cal.App.4th 294 [judgment reversed because former instruction failed to

convey this concept; consequently, CALJIC No. 5.56 was re-revised, as

given in this case].)

> Isaac had to get to his gun first because the other one said
> they were just going to have to shoot him. Isaac got to his

13

gun first and shot him before he could shoot back, and that's self-defense. It really is that simple. Kill or die. Defend yourself or die. And even a gang member has the right to defend himself. Should he have had a gun out there that night? No. But it doesn't mean that he has to die." (2RT 482-483.)

He pointed to the still photographs from the surveillance camera show four seconds elapsed from appellant backing up away from the Sureños and taking his gun out and shooting. (2RT 483-484; Exhibits 132-135 (ACT 33-36.) In fact, the whole encounter from when the Sureños are first seen walking toward the front of the store to the shooting takes 18 seconds. (Exhibits 132-143 (ACT 33-44.) That is reactionary behavior.

The instruction in CALJIC No. 5.12 regarding "fear alone" combined with the prosecutor's closing argument capitalizing on that misleading wording makes it likely that the jury believed that appellant was not entitled to claim reasonable or unreasonable self-defense even though he reacted in fear to Chupas and Ivan.

The prosecutor's closing argument compounded the error in another way – he exploited the jury's passion by appointing them representatives of the "community" and urging them to apply public opinion and feeling against gangs to decide the issues in the case rather than applying the law. (2RT 438-439.)

" 'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) An instructional error which lightens the prosecutor's burden on the elements of the offense necessarily contributes to the verdict. In this

14

case, that would be the combination of the misleading language that if appellant had any other emotion than fear would preclude claiming reasonable self-defense even if he acted because he was afraid of losing his life. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *Pope v. Illinois* (1987) 481 U.S. 497, 502; *Sullivan v. Louisiana* (1993) 508 U.S. 275 [erroneous reasonable-doubt instruction to jury]; *Yates v. Evatt* (1991) 500 U.S. 391, 403.)

In this case, the misleading jury instruction in combination with the prosecutor's "no reasonable gang member" argument very likely resulted in convincing the jury to ignore the strong evidence of reasonable *and* unreasonable self-defense.

II.

## IT WAS ERROR TO INSTRUCT THE JURY WITH CALJIC NOS. 5.54, 5.55 AND 5.56 BECAUSE THERE IS NO EVIDENCE THAT APPELLANT SOUGHT THE QUARREL OR INITIATED AN ASSAULT

The court instructed the jury with the principles of perfect self-defense. (2RT 517-522; 2CT 338-340; CALJIC Nos. 5.12, 5.14, 5.16, 5.17, 5.30, 5.31, 5.32, 5.50, 5.51, 5.52, 5.54, 5.55, 5.56.)

However, the evidence did not support instructing the jury that the right of self-defense is only available to a person who initiated an assault, or who sought a quarrel with the intent of creating the need for self-defense and the duties required in mutual combat. Wearing certain clothing indicative of gang membership or affiliation, in and of itself, is not a criminal act. (See Pen. Code § 186.21 [legislative findings re freedom of expression].) Indeed, the Sureños were engaged in like behavior. Eric Cabrera, a validated Sureño member, testified for the prosecution under a grant of immunity, that appellant and Tapia were just walking away when

15

Chupas and Ivan "raised up on them."[3]

> No words were spoken before the two guys just walked away.
> (1RT 67-68.) After that, some words were exchanged.
> Cabrera could not tell what was being said or by whom.[4]
> Cabrera told Chupas and Ivan "to chill." (1RT 68-69, 87.)
> "They (Chupas and Ivan ) were just trying to step up to
> somebody." (1RT 70; 91.)[5]

> Ivan and Chupas were standing in front of Cabrera. The
> other two guys were just walking away. Then, Cabrera saw
> Chupas and Ivan "walking, like, up, and that was it." Cabrera
> glanced again and saw the skinnier guy make a motion,
> pulling from his waist. The skinnier of the two guys walked
> back. (1RT 72.) Cabrera did not see the skinny person's face
> and couldn't identify him. (1RT 76.)

Sureño Ivan Garcia described the encounter as he and Chupas

initiating the confrontation with appellant, not the other way around. (2CT

432, 468, 471; 1RT 288-289.) Ivan walked up to the window with Chupas.

The Norteños were "mugging"[6] them so Chupas said something the other

"fools" didn't like and Ivan asked them, "where you guys from?" (2CT 468,

471; 1RT 288-289.) The skinny guy (appellant) "got scared, agitated and

panicked." (2CT 472.) Appellant said, "Franklin," then he backed up and

---

[3] Cabrera told Husted that Ivan "raised up" on Sandoval and Tapia,
meaning preparing to fight and Cabrera told him to chill. (1RT 275-276.)

[4] Cabrera told Detective Husted that Chupas and Ivan *could have*
said "chapete" or "buster," derogatory terms for Norteños. (1RT 93, 276.)

[5] Cabrera told Detective Husted this meant getting ready to fight.
(2RT 405.)

[6] According to Detective Husted, "mugging us" or "hard stare"
means "they were staring at them in sort of a negative fashion, maybe even
trying to challenge them, in a sense." (1RT 286.) Ivan Garcia never went
into any greater detail about how his rivals were mugging them. (*Ibid.*)

16

started shooting. Ivan was the closest to appellant, about five feet away. (2CT 476-477.)

Appellant reported the same sequence of events to Addison and Steffens, adding that Chupas said, "well, I guess I'm going to have to blast you then" and went for his gun. Appellant pulled his gun first and shot. (2CT 417; 1RT 193-194, 195.) Addison told Sandra that appellant told him the same thing. (1RT 194, 198.) Ivan described appellant as "scared, agitated, panicked" after Chupas and Ivan were verbally challenging him. (2CT 472.) Ivan thinks the rival (appellant) started shooting because of what his "homie," Chupas, said. (2CT 472.)

The evidence did not support giving the instructions on initiating an assault or mutual combat as it relates to determining appellant's right to self-defense. The evidentiary basis for instructing the jury with these concepts must be the prosecution's theory that once appellant answered he was "Franklin" that it was he who started the assault, not Chupas. (1RT 490 [DA closing argument].)

An instruction should not be given unless supported by substantial evidence. (See *People v. Perez* (2005) 35 Cal.4th 1219, 1235 [error to instruct on aiding and abetting theory when no predicate crime committed]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129 [if a jury is presented with multiple theories supporting conviction on a single charge and on review one theory is found unsupported by sufficient evidence, reversal is not required if sufficient evidence supports the alternate theory and there is no affirmative basis for concluding the jury relied on the factually unsupported theory because it is presumed jurors would not rely on a factually deficient theory] adopting the rule in *Griffin v. United States* (1991) 502 U.S. 46.)

17

In this case, giving these instructions contributed to the jury's verdict because it allowed the prosecutor to argue that being armed and answering "Franklin" put appellant in the position of aggressor, forfeiting his right to stand his ground. In the prosecutor's view, as soon as Sandoval said "Franklin" he accepted the Sureños' challenge to have a gun fight and forfeited his right to defend himself. The reason is because Sandoval "prepared for it" by cleaning his gun and bullets and "planned for it" by carrying a gun and expressing earlier in the day that he would blast a scrap if he saw one. (2RT 490.)

The Court of Appeal rejected appellant's argument finding that Ivan's perception that appellant was "mugging" (giving a hard stare) before he backed away from the line as well as appellant's alleged *post-offense* braggadocio supported giving the mutual combat and initial aggressor instructions. (Opn., p. 27.)

Even if Sandoval did "mug" his rivals, he did not initiate an assault. His conduct was to stand in line and back away when he was confronted with the challenge issued by Chupas, "Where are you from?" (2RT 352; 1RT 167-168.)

The court of appeal held that even assuming appellant's actions before pulling his gun did not amount to assault, there was no error because the jury was instructed to disregard inapplicable instructions. Even assuming the instruction referencing assault should have been excluded, the instructions concerning mutual combat and seeking a quarrel were clearly supported by the evidence. (Opn., p. 27.) In light of the prosecutor's arguments, set forth above, it is unlikely the jury would have applied this admonition to the instruction that an assault limited the right to self-defense.

The problem with instructing the jury on these irrelevant legal

theories is that the instructions erroneously supported the prosecutor's broad theme that the defendant had no justifiable right of self-defense because he lived a gang lifestyle. All of the witnesses agreed that the Sureños started this fatal confrontation. The gang expert supported the defense that appellant had to act or be killed. (2RT 398, 374, 403.)

CALJIC Nos. 5.54, 5.55 and 5.56 were not supported by the prosecution witnesses' testimony but instructing the jury on these principles that somehow appellant sought the quarrel at the AM/PM or initiated the confrontation forfeited his right to self-defense and played into the prosecutor's "no reasonable gang member" mantra. Since it is not possible to determine whether the jury rested on the factually unsupported instructions to reject appellant's defense, reversal is required.

III.

## AS A MATTER OF LAW, APPELLANT IS GUILTY OF NO MORE THAN VOLUNTARY MANSLAUGHTER

Our system of criminal justice is premised on the principle that for an action to be punishable as a crime, the act must be done with a concurrent criminal intent (§§ 7, 20; *People v. Vogel* (1956) 46 Cal.2d 798, 801, fns. 1 & 2; *In re Winship* (1970) 397 U.S. 358, 372 (conc. opn. of Harlan, J.) [burden of proof beyond a reasonable doubt].) Thus, causing the death of another human being is not necessarily a criminal act. For homicide to be a crime, it must result from an *unlawful* act performed with a concurrent criminal intent.

For example, one who kills another in justifiable self defense is not guilty of a crime. This is because the society recognizes that, under certain circumstances, one who kills in self-defense or defense of another is legally justified in doing so; therefore, the homicide is not *unlawful* because the

19

killer's intent was not criminal. Where the killer unreasonably believes defending himself is justified (*In re Christian S.* (1994) 7 Cal.4th 768, 776) or acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), he will be guilty of no more than voluntary manslaughter because he lacks malice. (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

The court of appeal held the evidence is sufficient to prove premeditated and deliberated murder relying on *People v. Sanchez* (2001) 26 Cal.4th 834, 849. (Opn., p. 28.) The court of appeal found it insignificant that in *Sanchez*, the defendants went looking for rival gang members while, in this case, appellant came upon his rivals by pure chance. In *Sanchez*, both defendant and Gonzalez admitted the allegations that their crimes were committed for the benefit of their street gangs. (*People v. Sanchez, supra,* 26 Cal.4th at 849-850.) "Although the actual shooting here may have been almost spontaneous, the mutual planning of one another's murder supports a finding of premeditation as to both defendant and Gonzalez." (*Id.,* at 850.)

In *Sanchez,* since it was unknown who actually fired the fatal shot that killed the innocent bystander, this Court decided questions relating to transferred intent and causation. Discussing what constitutes sufficient evidence to satisfy premeditation and deliberation in that context, the court quoted *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002:

> A studied hatred and enmity, including a *preplanned,* purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation." (*People v. Sanchez, supra,* 26 Cal.4th at 849.)

In *Rand,* the defendant, an avowed Crip, had an admitted motive for the killing; he also had the driver slow the car and virtually stop while he

aimed deliberately at the stranded persons he believed were rival gang members because they were wearing red clothing in a certain neighborhood.

The facts in *Rand* differ markedly from what occurred in this case. While it is undisputed that the Sureños and Norteños hate each other, and specifically, that appellant personally hates anyone he pegs to be a Sureño, in this case, the evidence does not show that he *went looking* for a Sureño to kill on that night or that he grabbed the opportunity to kill someone wearing blue clothing in a certain location, as Mr. Rand had.

Rather, in this particular set of circumstances, looking at only the prosecution's evidence, appellant and rival gang members stared at each other (2CT 468 [Garcia]) before appellant was confronted with two Sureño gang members calling him provocative, derogatory names, (2CT 468 [Garcia]; 1RT 275-276 [Cabrera to Husted] before issuing the coded challenge ("where you from?") then "raising up on him" when he said, "Franklon" (2CT 476-477 [Garcia].) Cabrera testified that no words were spoken before the two guys [appellant and Tapia] just walked away. (1RT 67-68.) According to the gang expert, this sequence of events would result in violence. (2RT 399.) Based on the foregoing evidence, it was reasonable for Sandoval to believe that the very next, immediate act by the Sureños would be to cause him great bodily injury or kill him.

Under these facts, as shown by the prosecution's evidence, the law says that appellant has the right to justifiably defend himself even though he hates Sureños so long as fear is what caused him to react.[7] (§ 198; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Lee Chuck* (1887) 74

---

[7] Ivan Garcia told Husted, the skinny guy (appellant) "got scared, agitated and panicked." (2CT 472.)

21

Cal. 30 [15 P. 322]; see AOB 25.)

The court of appeal also disagreed that these facts show that appellant was "provoked" such that a reasonable person would have reacted in the same manner under the same circumstances relying on *People v. Steele* (2002) 27 Cal.4th 1230, a capital case in which the defendant stabbed and strangled a developmentally disabled woman after hiring her as a prostitute claiming he "snapped" because of prior Viet Nam experiences and his hatred of women. The trial court refused the defense requested instruction but gave the standard instruction on voluntary manslaughter.

This Court held the trial court need not have given voluntary manslaughter instructions, at all, because the evidence of "passion" was more in the nature of diminished capacity which had been abolished by the Legislature.

> Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War, and that he just "snapped" when he heard the helicopter, may have satisfied the subjective element of heat of passion. (See *In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430], citing *People v. Berry, supra*, 18 Cal.3d at p. 515.) But it does not satisfy the objective, reasonable person requirement, which requires provocation by the victim. (*In re Thomas C., supra*, 183 Cal.App.3d at p. 798.) "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " (*People v. Wickersham, supra*, 32 Cal.3d at p. 326.) "[E]vidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry." (*People v. Morse* (1969) 70 Cal.2d 711, 735 [76 Cal.Rptr. 391, 452 P.2d 607].) (*Id.*, at 1253.)

Obviously, the evidence in this case is quite different from that in

22

*Steele.* Here, the evidence showed that when Ivan Garcia and Chupas were verbally taunting appellant, they may have said "chapete" or "buster," derogatory terms for Norteños. (1RT 93, 276.)[8] Cabrera told Husted that Ivan "raised up" on Sandoval and Tapia, meaning preparing to fight and Cabrera told him "to chill." (1RT 275-276.) Ivan Garcia told Detective Husted that he thought appellant shot Chupas because of what Chupas said to him. (2CT 472.) Garcia also admitted that both he and Chupas said things to appellant that appellant did not like after they stared at each other. (2CT 468.)

The court of appeal states that being called a provocative, derogatory name with the rivals preparing to fight is not adequate provocation. (Opn., p. 32.) However, in *People v. Lee* (1999) 20 Cal.4th 47, this Court acknowledged that "the provocative conduct by the victim may be physical or verbal" so that "it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*Id.*, at p. 59.)

Appellant submits that the evidence before his jury amounted to no more than voluntary manslaughter, as a matter of law. Accordingly, the first degree murder conviction and special allegations should be reversed and the matter remanded for a new trial on a charge no greater than voluntary manslaughter. (*Burks v. United States* (1978) 437 U.S. 1, 18.)

---

[8] The gang expert testified that "chapete" is a derogatory term, which is slang for "red in the face," used by Sureños referring to Norteños having historically worked as farm workers with the sun beating down on them, as a way to make fun of them. "Buster" is another term of disrespect referring to the Nortenos' farming background – busting up the sod. (2RT 372.)

IV.

LERCH'S RAP LYRICS, EERILY SIMILAR TO THE
PROSECUTION'S THEORY OF THE CASE, BUT OF
WHICH APPELLANT WAS NOT AWARE, RENDERED
THE TRIAL FUNDAMENTALLY UNFAIR, REQUIRING
REVERSAL

Appellant contends that admitting Lerch's rap lyrics,[9] eerily similar
to the prosecution's theory of the case, rendered his trial fundamentally
unfair, especially when viewed in the light of the prosecutor's claim that
there is no right to self-defense when a person is an admitted gang member.

In *People v. Partida* (2005) 37 Cal.4th 428, this Court held that a
defendant who objects to the admission of evidence on the grounds that it is
more prejudicial than probative under Evidence Code section 352 may also
argue on appeal that the error deprived him of his federal right to due
process. (*Id.*, at 431, 435.) Error of this kind rises to the level of a due
process violation only if it renders the trial fundamentally unfair. (*Id.*, at
432, 436.) This Court explained that "Once the reviewing court has found
error in overruling the trial objection, whether that error violated due
process is a question of law for the reviewing court, ..." (*Id.*, at 436-437.)

Appellant's trial was severed from his co-defendant, Robert Tapia
when Tapia accepted a plea bargain for voluntary manslaughter.[10] The
court of appeal found that admitting rap lyrics written by Tapia which

---

[9] The lyrics are repeated in the court of appeal's opinion on page 9.

[10] Prior to the completion of jury selection, co-defendant Tapia aka
Lerch entered a guilty plea to voluntary manslaughter and admitted his prior
convictions for a total term of 21 years. (2CT 306; 375; 1RT 37 [reported
but not included]; 1RT 44-45 [jury admonished not to consider or discuss
why Tapia no longer present].)

24

appellant had never seen were relevant to prove that he associated with a gang whose members engaged in a pattern of criminal behavior and that he committed the crime with the intent to promote the gang's criminal activities under section 186.22, "even if defendant was not aware that the fellow gang member has written about the subject." (Opn., p. 13.)

The court of appeal disregarded appellant's argument that the writing was unnecessary because there was already a "vast amount" of other evidence to prove the 186.22 charge because "[t]his point does not demonstrate abuse of discretion by the trial court." (*id.*, at p. 13.)

However, in *Old Chief v. United States* (1997) 519 U.S. 172, 180-185, the United States Supreme Court issued this warning apropos to admitting Tapia's lyrics in the prosecution against Sandoval:

> The first understanding of the rule is open to a very telling objection. That reading would leave the party offering evidence with the option to structure a trial in whatever way would produce the maximum unfair prejudice consistent with relevance. He could choose the available alternative carrying the greatest threat of improper influence, despite the availability of less prejudicial but equally probative evidence. The worst he would have to fear would be a ruling sustaining a Rule 403 objection, and if that occurred, he could simply fall back to offering substitute evidence. This would be a strange rule. It would be very odd for the law of evidence to recognize the danger of unfair prejudice only to confer such a degree of autonomy on the party subject to temptation, and the Rules of Evidence are not so odd. (*Old Chief v. United States, supra,* 519 U.S. at 183-184.)

In this case, appellant objected to admitting the lyrics on the grounds that the lyrics were not relevant as to appellant and the prejudice outweighed the probative value, particularly since there was other evidence available for the expert witness to render an opinion on appellant's and

Lerch's gang affiliation. (2RT 387-388.) The prosecutor argued that in proving the gang enhancement, he was permitted to prove that Tapia was a Norteño gang member, that one of the theories of the prosecution involved aiding and abetting and the jury would be so instructed and the lyrics showed *Tapia*'s own culpability in the aiding and abetting and it was indicative of the gang mindset regarding respect and violence that the expert talked about. (2RT 388.)

There were several alternatives to prove the prosecution's stated reasons for introducing Lerch's rap lyrics, e.g., numerous gang-related items *other than* the rap lyrics were identified by Detective Mouzis as seized from Tapia's residence which proved he was a validated Norteño, e.g., the specialized graffiti on his bicycle [Ex. 31], red clothing, photograph of Tapia's Norteño Mongolian hairstyle, a black belt associated with 14th Avenue Norteños. (2RT 367, 377-381, 384.) Tapia admitted to Mouzis that he was a Norteño and deeply involved. (2RT 383-384.)

Moreover, Tapia was no longer on trial. There was no dispute that Sandoval was the shooter. Aiding and abetting was no longer a relevant theory of culpability. The lyrics were written by Lerch, not appellant. Appellant had never seen them. Besides that, there is rap music on the radio everyday expressing basically the same sentiments.

In addition, several gang members testified at this trial (Eric Cabrera, Enrique Torres, Robert Addison, Ivan Garcia). The jury could see for themselves how they acted, how important it was to stay true to the gang and not be a snitch. Sandra Steffans testified that Lerch and Sandoval said they wanted to "get a scrap" and after the shooting, Sandoval said, "if he were going to prison, it'd be for something worth it." (1RT 197.)

Lerch's lyrics which were purportedly introduced to prove the gang

26

mindset and corroborate the gang expert is essentially propensity evidence – that what is written, will happen.[11] (See *Michelson v. United States* (1948) 335 U.S. 469, 475-476 [propensity evidence is relevant but tends to "overpersuade" the jury].)

However, the lyrics did not belong in Sandoval's trial because Sandoval did not write them and he did not know about them. As to Sandoval, personally, the lyrics prove nothing other than he associates with a person who writes lyrics which he does not share with others, at least not appellant.

Reversal is required under the federal due process clause if the erroneously admitted evidence makes the trial fundamentally unfair. (*People v. Partida, supra,* 37 Cal.4th at 439 citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *Spencer v. Texas* (1967) 385 U.S. 554, 563-564; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."]; see also *Duncan v. Henry* (1995) 513 U.S. 364 at 366; U.S. Const., 14th Amend.)

Appellant submits that admitting Lerch's graphic and provocative lyrics in evidence, enabling the prosecutor to argue the lyrics "were the essence of being a gangster" and there was no such thing as a "reasonable gangster," rendered the trial fundamentally unfair because it convinced the jury to give short shrift to his claim that he acted in self-defense, perfect or imperfect in favor of sending a "community" message that gang violence would not be tolerated.

---

[11] The prosecutor claimed in closing argument that Lerch's lyrics were "the essence of what it means to be a gangster." (2RT 441.) "You kill your rivals to gain the respect that you want as a gang member." (*Ibid.*)

27

V.

THE PROBATION REVOCATION DEPENDS ON THE
INTEGRITY OF THE MURDER CONVICTION

The trial court revoked appellant's probation in case # 03F02411 "in light of conviction in case #03F08490." (1ACT[12] 5.)

Initially, the prosecutor charged appellant with violating section 12021, subdivision (a)(1) [felon in possession of firearm] in count two of the complaint. (1CT 9.) However, on May 24, 2004, that count was dismissed at the end of the preliminary hearing when the prosecution did not present sufficient proof of appellant's status as a felon. (1CT 237; 2, 14.)

If the conviction in case #03F08490 is reversed, the probation revocation would also be reversed because appellant may have had a legal defense to the probation revocation petition insofar as he had a right to possess the gun, in these particular circumstances, notwithstanding condition #7 of his probation. (*People v. King* (1978) 22 Cal.3d 12, 24 [felon in possession of gun has right to defend himself by using firearm; cf. *People v. Rodriguez* (1990) 51 Cal.3d 437 [procedures on probation revocation; standard of proof; *Morrissey v. Brewer* (1972) 408 U.S. 471, 489 [same].)[13]

_____

[12] "1ACT" refers to the Augmented Clerk's Transcript filed on 12/7/05 containing documents relating to case #03F02411.

[13] In *People v. Rhodes* (2005) 129 Cal.App.4th 1339, the court erred because it failed to instruct on this principle. The court reversed the judgment because the error had allowed the district attorney to argue (erroneously) at least eight times that as a convicted felon, Rhodes did "not have the right as an individual, you and I, to stand his ground and not retreat." (*Id.*, at 1347-1348.)

## CONCLUSION

For the foregoing reasons, appellant urges this Court to grant review to settle these important questions of law.

Dated: 2/7/08

Respectfully Submitted

_Isaac S. Sandoval_

ISAAC L. SANDOVAL

EXHIBIT 1

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

- - - -

# FILED

NOV 2 0 2006

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT
BY_____ Deputy

THE PEOPLE,

      Plaintiff and Respondent,

    v.

ISAAC SANDOVAL,

      Defendant and Appellant.

C050080

(Super. Ct. Nos. 03F08490,
  03F02411)

Defendant Isaac Sandoval appeals from a judgment for first

degree murder (Pen. Code, § 187[1]), committed for the benefit of a

criminal street gang (§ 186.22, subd. (b)(1)), with personal and

intentional discharge of a firearm causing death (§ 12022.53,

subd. (d)), and with a prior serious felony conviction (§ 667,

subd. (a)).  Defendant does not dispute that he is a gang member

and shot the victim, but defendant asserts he acted in self-

defense.  Defendant claims insufficiency of the evidence, as

well as evidentiary and instructional errors.  We shall modify

_____

[1] Undesignated statutory references are to the Penal Code.

1

the judgment to reflect the proper sentencing statutes, and we shall otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2004, defendant (and codefendant Robert Tapia) were charged with the September 26, 2003, murder of Isidro Garcia, plus allegations of firearm use and criminal street gang activity, as follows: Personal and intentional discharge of a firearm causing death (§ 12022.53, subd. (d)); personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); personal use of a firearm (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)); being a principal in an offense where a principal intentionally and personally discharged and personally used a firearm causing great bodily injury to a person other than an accomplice (§ 12022.53, subds. (b), (c), (d), and (e)(1)); and committing the offense for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). It was alleged defendant had a prior serious felony conviction for a 2003 robbery.

Tapia changed his plea during voir dire, to a plea of no contest to voluntary manslaughter, and he is not a party to this appeal.

The evidence at trial included the following:

On September 26, 2003, at around 10:00 p.m., defendant shot and killed Isidro Garcia (nickname Chupas) at an AM/PM minimarket and gas station. Defendant is a member of the

2

Norteño Vario Franklin (sometimes spelled Franklon) Boys gang and was accompanied by Robert Tapia (nickname Lurch), while companion Robert Addison waited in the car. The victim was a member of a rival gang (the Sureños) and was accompanied by Sureños Eric Cabrera and Ivan Garcia, while companion Enrique Torres waited in the car.

Defendant did not dispute these facts but claimed the prosecution failed to show defendant was not acting in self-defense.

Prosecution witness Sandra Steffens testified she spent part of the day on September 26, 2003, at her ex-boyfriend's cousin's home, socializing with a group of people, including defendant, Tapia, and Addison (who was introduced to defendant that day). Defendant had a gun. Steffens saw him empty the bullets, play with the gun, wipe the bullets with his shirt, and reload the gun wearing a glove. Addison started talking about committing a robbery. Defendant talked about shooting a "scrap" (a derogatory term for a Sureño) if he saw one. Defendant also said he was going to "peel someone's cap back." Around 7:00 p.m., defendant, Tapia, and Addison left to go for a drive in Addison's car.

After 10:00 p.m., defendant, Tapia, and Addison returned to the house. Addison, who appeared scared, told Steffens that they stopped at the AM/PM (to get cigarettes, according to what Tapia later told the police), and defendant and Tapia got out of the car, went up to the store window, and saw some "scraps" who

asked defendant and Tapia where they were from (it appears
Addison, who stayed in the car, was repeating to Steffens what
defendant had told him).   Defendant said he was from Franklin,
and the man said, "[w]ell, I guess I'm just going to have to
blast you then."   The man approached defendant and went to pull
a gun, but defendant pulled out his own gun and shot the man.
Steffens then went outside and talked to defendant, who told her
the same thing, that when he and Tapia were walking up to the
store window, the man asked where he was from, and defendant
said, "Frankl[i]n," and the man said, "[w]ell, I guess I'm just
going to have to blast you then."   Defendant said the man
grabbed for his gun, and defendant pulled out his gun and shot
him, hitting him in the head from a distance of 20 feet.
Defendant's demeanor in relating the story was normal and proud.
He described the men as "scraps."   Defendant said Tapia fired a
gun after the victim's companion shot one round at him.   The
night of the shooting, defendant also told Steffens that, if he
was going to go to prison, it would be for "something that was
worth it."

     At trial, Addison testified he did not witness a shooting,
did not remember going to the AM/PM that night, and did not
recall telling a detective that he saw a shooting.   Addison
testified he was on his way to prison for unrelated crimes, and
did not plan on going with a "snitch" label.   The jury heard
testimony from a police detective and an audiotape of an
interview in which Addison said he drove to the AM/PM and was in

the car when the shooting happened.  When defendant and Tapia got back into the car, defendant said, "the dude pulled a gun" on him, so defendant shot first.

Although Sureño member Ivan Garcia's trial testimony denied being present at the shooting, he told a detective in a recorded interview three months after the shooting that he was with the victim at the AM/PM, and they recognized defendant and his companion as rival gang members (by their appearance).  One of the victim's group said something to defendant and his companion because they were "muggin," or staring in a disrespectful, negative or challenging way.  Ivan said something (he did not remember what), and defendant took out his gun and fired it.

Sureño member Cabrera, testifying under a grant of use immunity, said he was standing behind and could see the arms of the victim and Ivan Garcia, and neither made a motion as if they were reaching for a gun.  After defendant fired his gun, Cabrera took out his own gun and fired it as he hopped over a fence.  He later turned his (.9 millimeter) gun over to the police.  Two .9 millimeter shell casings and two spent bullets were found near the AM/PM dumpster.

Images from the store's video surveillance camera were admitted into evidence but lacked clarity.

The paramedics removed a .38 caliber handgun from the victim's left front pants pocket.  The gun had a magazine in the handle, loaded with four rounds.  The officer who took the gun did not recall if there was a round in the chamber, but if there

had been, he would have removed it and booked it into evidence. The criminalist found no evidence that any bullets were fired from the victim's gun.

At the hospital, Isidro Garcia died from a gunshot wound with entry on the left side of his head. The bullet traveled toward the right front of the head in a downward trajectory and came to rest adjacent to his right eye. His hands were not tested for gunshot residue.

Bullet fragments recovered from the victim's body indicated there were two bullets fired from the same gun, probably a .38 caliber gun, which was not recovered.

Police detective Christopher Mouzis testified as an expert on Hispanic street gangs. A person, such as defendant or Tapia, who goes into the community wearing a red rag, a red VFB belt buckle, and a visible VFB tattoo across the knuckles, is letting rival gang members know he is with the Vario Franklin Boys, Norteños gang.[2] When a gang member such as the victim asks "where you from," he is issuing a challenge to the person, wanting to know if the person represents a gang. If the person wants to accept the challenge and escalate the situation, he will throw a hand sign or say (for example) Franklin, to

_____

[2] The expert spoke of the meaning of teardrop tattoos near the eyes, but upon examining defendant's face in person in the courtroom, the expert said the tattoos next to defendant's eyes were not of teardrops, but the numbers three and six, which referred to a street within the Franklin neighborhood.

identify his gang affiliation.  There will be an altercation.
If a person in defendant's position wanted to de-escalate the
situation (which would have been tough, given his visual display
of gang affiliation), he could try to walk away or not say
anything, or say he did not represent anyone.  The expert opined
the shooting benefited the Norteños.

Defendant did not testify at trial.  The defense argued on
the evidence that the prosecution had failed to show defendant
did not act in self-defense.

The jury found defendant guilty of first degree murder and
found true the allegations that defendant personally and
intentionally discharged a firearm causing death (§ 12022.53,
subd. (d)), personally and intentionally discharged a firearm
(§ 12022.53, subd. (c)), personally used a firearm (§§ 12022.5,
subd. (a)(1), 12022.53, subd. (b)), was a principal in an
offense where a principal intentionally and personally
discharged and personally used a firearm causing death to a
person other than an accomplice (§ 12022.53, subds. (b), (c),
(d), and (e)(1)), and committed the offense for the benefit of,
at the direction of, or in association with a criminal street
gang with the specific intent to promote, further, and assist in
criminal conduct by gang members (§ 186.22, subd. (b)(1)).  The
trial court found true the prior serious felony conviction.

The trial court sentenced defendant to 25 years to life for
first degree murder, doubled to 50 years to life, based on the

prior strike under section 667, subdivision (e)(1).[3]  The court

imposed an additional five-year term for the prior conviction

(§ 667, subd. (a).)  The court imposed an additional consecutive

sentence of 25 years to life, for the section 12022.53,

subdivision (d), enhancement.  Because of this enhancement,

pursuant to section 12022.53, subdivision (f), the court did not

impose sentence for the other firearm enhancements.  The court

stated that, pursuant to section 186.22, subdivision (b)(5), the

10-year gang enhancement (§ 186.22, subd. (b)(1)) would not be

imposed because the case was covered by the 15-year minimum

parole eligibility term of section 186.22, subdivision (b)(5).[4]

The court also found a probation violation in another case

(No. 03F02411) and imposed a concurrent middle term of three

years.

DISCUSSION

I.  Admission of Tapia's "Rap Poetry"

Defendant contends his due process rights were violated by

the admission of Tapia's "rap poetry" to prove defendant's

intent and motive.  Defendant thinks that, because Tapia's

_____

[3] The People note the trial court said section 667, subdivision
(e)(2), (which is for two or more strikes).  Here, there was
only one prior conviction, and therefore the appropriate
provision is section 667, subdivision (e)(1).  We shall order
modification of the judgment.

[4] The abstract of judgment does not mention section 186.22.  We
shall order modification of the abstract of judgment, as stated
in our disposition.

8

change of plea before admission of the evidence removed Tapia as a codefendant, Tapia's poetry "lost its relevance." We disagree.

A. Background

During questioning of its expert witness, the prosecution introduced two handwritten pages as writings of Robert Tapia, found in his home.[5] We quote the pages verbatim, without correcting the spelling and grammar errors:

"Savage 1 ['4 times' written above] and Lurch what who it be the muthafuckas from that Sac. dressed in black and strapted with gats [guns] having suwer rats on there knees bagging please giving me reason not to shot him but fuck it I shot'm in the head watch him bleed in the bed all red tha muthafucka start to shed tha next day tha police and investigates looking for me had tha scraps face erase with no trace little did they no they had no case it's me lurch running up in niggas were it hearts and flash on yal like cable you aint able to fuck wit me grab a scrap throw um in tha

"cage grab tha gage and start tha muthafukin rage up on tha stage because I shake muthafucka rattle & roll I'm to hard to control like a troll it's tha season of soul, killin niggas & ho's throwing bow elbows cause I'm bout explode."

---

[5] Defense counsel made his objection at sidebar before the evidence was shown to the gang expert witness, and the court heard the objection during the next recess, after the witness gave his interpretation of the writing.

The prosecution's expert testified the writing had lines through most of the letters "s," which in gang culture was a way to show disrespect for the Sureño gang. The expert interpreted the writing as talking about killing someone. The expert then testified he spoke with Tapia, who admitted being a Norteño and being deeply involved with the gang. He also wore his hair in the warrior hairstyle of the Norteños and wore a belt buckle with an "A" representing the Avenue claimed by the gang, the 14th Avenue Norteños.

Defense counsel objected to the writing, on the grounds that there was no evidence defendant had any knowledge of it, and the writing was irrelevant and more prejudicial than probative (Evid. Code, § 352 [court has discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice]), given the "vast amounts" of other evidence as to gang affiliation of defendant and Tapia.

Although part of the prosecutor's position in the trial court was that the evidence was relevant to Tapia's own culpability (which was no longer directly in issue as to Tapia, since he had already changed his plea to no contest to voluntary manslaughter), the prosecutor also argued to the trial court that (1) one of the avenues to prove the section 186.22 criminal street gang allegation was to show defendant acted in association with members of the Norteño gang; (2) the writing expressed a scenario similar to the facts of this case; and

10

(3) the writing corroborated the gang expert's testimony that violence was part of the gang's mindset.

The trial court overruled the evidentiary objection, stating the evidence was an expression of the gang's mentality by a gang member, was relevant to defendant's motive and intent, corroborated the gang expert's testimony, and was more probative than prejudicial.

In closing argument to the jury, the prosecutor said the gang expert talked about the gang lifestyle being predicated on violence, "and all we need to do is look to the lyrics that were penned by Robert Tapia in this case:  Dressed in black and strapped with gas [sic], having sewer rats on their knees, begging, please, giving me a reason not to shoot him, but, fuck it, I shot him in the head.  Watch him bleed.

"That is the lifestyle that the defendant chooses.  That is what his lifestyle of being a gang member is predicated on, and that is the essence of what it means to be a gangster."

B.  Analysis

Defendant argues the trial court erred in admitting Tapia's writing because it lost its relevance after Tapia changed his plea, there was no evidence defendant was aware of the writing, the writing was not relevant to prove defendant's state of mind, and whatever probative value the writing had to prove Tapia's gang membership and the section 186.22 allegation was outweighed by the prejudicial impact.  We disagree.

Pursuant to the language of section 186.22, subdivision (b)(1), defendant was charged with committing the offense "for the benefit of, at the direction of, and in association with a criminal street gang, to wit, NORTEÑO, with the specific intent to promote, further and assist in criminal conduct by gang members . . . ."

Pursuant to section 186.22, subdivision (f), a criminal street gang is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [specified criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

Here, the writing was relevant to show defendant associated with a gang whose members engaged in a pattern of criminal behavior.  The writing (as interpreted by the gang expert) demonstrated that the Norteños and Sureños were rivals, that disputes were resolved with deadly violence, and that members of the Norteños had motive and intent to kill members of the Sureños.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [expert testimony about gang culture is relevant in a gang-related case].)

Thus, evidence of the gang's criminal goals and activities, as committed to paper by Tapia, was clearly and directly relevant to defendant's culpability for committing a crime with

the intent to promote the gang's criminal activities under section 186.22, even if defendant was not aware that the fellow gang member has written about the subject.

We review the trial court's ruling on an Evidence Code section 352 objection under a standard of abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  For purposes of Evidence Code section 352, "prejudice" refers to evidence that "uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues." (*Ibid.*)

Defendant cites authority that, due to the inflammatory nature of gang evidence, it should be excluded if its sole relevance is to prove criminal disposition, and should be used only when it is logically relevant to some material issue other than character trait.  (E.g., *People v. Ruiz* (1998) 62 Cal.App.4th 234, 240 [in prosecution for sale of controlled substance, trial court did not abuse its discretion in admitting limited gang evidence to show possible motive for third party to lie to protect fellow gang member].)  Here, however, the writing was not used solely to prove criminal disposition, but was used to prove the elements of the section 186.22 charge.

Defendant argues the writing was unnecessary because there was already a "vast amount" of other evidence to prove the section 186.22 charge.  This point does not demonstrate abuse of discretion by the trial court.

Defendant argues there was prejudice because the jury could have used Tapia's writing to decide that defendant shot the

13

victim out of hatred, not fear, even though defendant did not even know the writing existed.  Defendant argues the admission of the evidence violated his right to due process, rendering the trial fundamentally unfair and triggering a harmless-beyond-a-reasonable-doubt standard of review (*People v. Partida* (2005) 37 Cal.4th 428; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]), because its inflammatory nature would cause the jury to reject his defense out of hand, and indeed the jury took around 90 minutes "to do just that."  Defendant fails to show applicability of the *Chapman* standard and fails to show reversible error even under that standard.  We do not weigh prejudice based on a defendant's speculation that a jury rejected his defense "out of hand."  Moreover, since the writing was not the only evidence of the gang's criminal activities, defendant's prejudice argument does not persuade.

Defendant argues that, even under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, it is reasonably probable he would have received a better result had the evidence not been admitted, because "without the lyrics, written by an absent co-defendant and which [defendant] never even saw, the jury would more than likely have believed [defendant] acted in self-defense, at least unreasonably [*sic*]."  On this record, this argument is nothing more than wishful thinking.

We conclude defendant fails to show any ground for reversal based on admission of Tapia's writing.

II.  Admission of Tapia's Comment

Defendant argues the trial court erred in admitting testimony of Sandra Steffens that, shortly before the shooting, in the presence of defendant, Tapia said that if he saw a "scrap" (a derogatory term for Sureños), he would shoot him.

The trial court sustained defendant's motion to strike the testimony as hearsay.  The prosecutor argued the evidence was admissible under Evidence Code section 356 (which allows a party to inquire into the whole of a conversation where the adverse party has introduced part of the conversation).[6]  The court indicated the prosecutor would have to lay a foundation.  The prosecutor did not do so but merely elicited from the witness that defendant was present, Tapia spoke loud enough to be heard, and defendant did not join in that conversation.

We see no evidentiary error, since the trial court sustained defendant's motion to strike the evidence and later instructed the jury generally to disregard "any evidence that was stricken by the court; treat it as though you had never heard of it."  Additionally, although the prosecutor repeated Tapia's comment about killing a scrap while eliciting the further testimony from Steffens that defendant was present but

---

[6] On appeal, the People say adoptive admission would have been a more appropriate basis for admission of the evidence.

15

said nothing, the jury was later instructed generally that a question is not evidence.

Assuming for the sake of argument that evidentiary error occurred, it was clearly harmless (*People v. Watson, supra*, 46 Cal.2d at p. 836), because Steffens went on to testify that *defendant himself* stated later in the day (but still before the shooting) that if he (defendant) saw a scrap, he (defendant) would shoot him. We reject defendant's suggestion that, because he made the same comment, admission of Tapia's comment was unnecessary and therefore constitutes prejudicial error warranting reversal of the judgment. We also reject defendant's view that Tapia's comment (and his poetry) convinced the jury to convict defendant because he is a "gangster."

We conclude there was no prejudicial evidentiary error.

III.   CALJIC No. 5.12

Defendant contends CALJIC No. 5.12 erroneously instructed the jury that a defendant is not allowed to feel any emotion other than fear when reacting to a threat of imminent harm. According to defendant, it is important in a gang case for the jury to understand that a party killing in self-defense may harbor other emotions, because otherwise the prosecution can argue, as it did in this case, that the gang member's lifestyle and rivalry with other gangs will always preclude a successful claim of self-defense, reasonable or unreasonable. The contention is without merit.

16

The trial court instructed the jury with CALJIC No. 5.12, as follows:

"The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:

"1. That there is imminent danger that the other person will either kill him or cause him great bodily injury; and

"2. That it is necessary under the circumstances for him/her to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to himself.

"A bare fear of death or great bodily injury is not sufficient to justify a homicide. *To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone.* The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm." (CALJIC No. 5.12, italics added.)

The italicized language, to which defendant objects, is taken directly from the statute, section 198, which provides: "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197 [killing in self-

defense], to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, *and the party killing must have acted under the influence of such fears alone.*" (§ 198, italics added.)

Defendant acknowledges section 198 and *People v. Trevino* (1988) 200 Cal.App.3d 874, 879, which said the defendant's anger or other emotions did not preclude the defense, but emotions other than fear could not be causal factors in the decision to use deadly force. "[I]t would be unreasonable to require an absence of any feeling other than fear, before the homicide could be considered justifiable. Such a requirement is not a part of the law, nor is it a part of CALJIC No. 5.12. Instead, the law requires that the party killing *act* out of fear alone." (*Ibid.*)

Thus, the instruction was not erroneous.

To the extent defendant thinks additional instruction should have been given, he has forfeited the matter by failing to request any such instruction in the trial court. (*People v. Johnson* (1993) 6 Cal.4th 1, 52.) Defendant's reply brief cites section 1259[7] as authorizing review despite the forfeiture.

---

[7] Section 1259 provides: "Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court,

However, section 1259 allows review of instructions given, refused, or modified; it does not authorize review where a defendant claims an additional instruction should have been given but the defendant failed to ask the trial court to give such an instruction. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [party may not complain on appeal that jury instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language].)

Under the same heading of instructional error, in asserting prejudice from the supposedly erroneous instruction, defendant suggests the prosecutor distorted the proper, facial meaning of the instruction by arguing to the jury, in effect, that defendant's gang lifestyle precluded him from claiming self-defense, reasonable or unreasonable, because there is no such thing as a "reasonable gang member" and there is no "reasonable gang member" standard. Defendant also argues the prosecutor in effect urged the jury to decide the case based on its hatred of gangs.

Assuming for the sake of argument there was something objectionable about the prosecutor's closing argument to the jury, defendant has forfeited the contention because he failed

and which affected the substantial rights of the defendant. The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.)

to object in the trial court, and an admonition to the jury
could have cured any misstatement of the law. (*People v. Hill*
(1998) 17 Cal.4th 800, 820.) Thus, the defense cannot stand
silent during the prosecution's closing argument and then argue
on appeal (as defendant does in this case) that the
prosecution's closing argument proves prejudice from
instructional error.

Moreover, defendant fails to point to anything
objectionable about the prosecutor's closing arguments to the
jury. The prosecutor argued defendant was not acting under the
influence of fear alone. The prosecutor also argued self-
defense turned on what a reasonable person would do, not what a
reasonable gangster would do. This is a correct statement of
the law.

Thus, for the killing to be in self-defense, the defendant
must actually and reasonably believe in the need to defend.
(*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) In the
context of the battered woman syndrome, *Humphrey* said, "Although
the belief in the need to defend must be objectively reasonable,
a jury must consider what 'would appear to be necessary to a
reasonable person in a similar situation and with similar
knowledge . . . .' [Citation.] It judges reasonableness 'from
the point of view of a reasonable person in the position of
defendant . . . .' [Citation.]" (*Id.* at pp. 1082-1083.) To do
this, said *Humphrey*, the jury must consider all the facts and
circumstances in determining whether the defendant acted in a

manner in which a reasonable person would act in protecting his own life or bodily safety, and the defendant is entitled to have a jury consider all the elements in the case which might be expected to operate on his mind. (*Ibid.*)  The Supreme Court specified, however, that it was "not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard.  Our decision would not, in another context, compel adoption of a '"reasonable gang member" standard.'"  (*Id.* at p. 1087.)  "The jury must consider the defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm." (*Ibid.*)

Defendant acknowledges courts have rejected defense attempts to craft subclasses of reasonable persons, such as a reasonable poverty-stricken Hispanic person.  (*People v. Romero* (1999) 69 Cal.App.4th 846, 852.)  Defendant says he is not claiming he was entitled to have the jury instructed to apply a reasonable gang member standard, but rather he is claiming that the prosecutor's argument amounted to the converse -- that defendant's gang lifestyle precluded him from claiming self-defense, reasonable or unreasonable, because there is no "reasonable gang member" standard.  Defendant cites the prosecutor's argument to the jury that "[t]he reasonable person standard is not the reasonable gang member standard.  It is a

community standard that we set.  We do not look at these cases
from the viewpoint of a hardened gangster.  We look at these
cases from, and these issues from, the perspective of a
reasonable person."  Defendant also refers to the prosecutor's
closing argument that "[w]e have a jury of 12 people who sit in
this box because when we are talking about a reasonableness
standard, when we are talking about what's reasonable, we are
talking about a community standard.  That's what we do in this
case.  We as a community set our standards.  [¶] And what we as
a community are not prepared to ever do is sanction gang
shootouts at the AM/PM mini market.  That's why we have 12
people in this box, because what we're looking for is a
community standard; not just a rote application of a fact to the
law, but we're asking you how do reasonable people react?  As a
community, how do we expect reasonable people to act?"  We see
nothing wrong with the prosecutor's arguments.

The prosecutor also argued that planning and preparing to
shoot someone undermines the claim of self-defense, and argued
that when talking about "a gangster who sits around the house
talking about killing scraps, wiping down the bullets before he
puts them back in the gun, living a lifestyle that is predicated
on killing his rivals, going to the AM/PM with his rag hanging
out of his pocket with his VFB belt with the tattoos and a .38
Special in his pocket, we -- our gut, our instinct tells us that
is murder. . . . [¶] . . . [¶] . . . It's the issue of planning
and preparation.  It's the concept that . . . the defendant was

22

not acting in a 100 percent reactionary state of mind, that he had a particular mental state going into this, that he had the mens rea we talked about. He had the guilty mind."

We reject defendant's argument that the "logical conclusion" of the prosecution's argument is that no one could ever claim self-defense if he carried a gun for protection in a dangerous neighborhood because, by being prepared, he would have planned to defend himself by killing his assailant.

Defendant cites *People v. Lee Chuck* (1887) 74 Cal. 30, which merely held the trial court erred in excluding evidence of the victim's hostility and threats against the defendant. No such exclusion occurred in this case.

We have reviewed the prosecutor's closing argument to the jury and find nothing objectionable.

Defendant fails to show grounds for reversal based on CALJIC No. 5.12.

IV.  CALJIC Nos. 5.54, 5.55, and 5.56

Defendant contends the trial court erred in instructing the jury with CALJIC Nos. 5.54, 5.55, and 5.56, because there was no evidence that defendant sought the quarrel or initiated an assault. We consider this argument despite defendant's failure to object in the trial court, but we see no grounds for reversal.

The trial court instructed the jury with CALJIC No. 5.54, as follows:

23

"The right of self-defense is only available to a person who initiated an assault, if

"1. He has done all of the following:

"A. He has actually tried, in good faith, to refuse to continue fighting;

"B. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and

"C. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he has stopped fighting.

"After he has done these three things, he has the right to self-defense if his opponent continues to fight, or

"2. if the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense."

The court also instructed the jury with CALJIC No. 5.55, as follows:

"The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

The court also instructed with CALJIC No. 5.56:

"The right of self-defense is only available to a person who engages in mutual combat:

"1. If he has done all the following:

24

"A. He has actually tried, in good faith, to refuse to continue fighting;

"B. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and

"C. He has caused by words or conduct his opponent to be aware, as a reasonable person, that he has stopped fighting; and

"D. He has given his opponent the opportunity to stop fighting.

"After he has done these four things, he has the right to self-defense if his opponent continues to fight, or

"2. If the other party to the mutual combat responds in a sudden and deadly counterassault, that is, force that is excessive under the circumstances, the party victimized by the sudden excessive force need not attempt to withdraw and may use reasonably necessary force in self-defense."

Defendant argues no substantial evidence supports these instructions. He also claims the only evidentiary basis for the instructions was the prosecution's theory that defendant initiated the assault when he answered, "Franklin" (though defendant fails to support this assertion with a citation to the record).

Acknowledging but ignoring the standard calling for review of the evidence in the light most favorable to the judgment (*People v. Carter* (2005) 36 Cal.4th 1114, 1156), defendant

focuses on evidence favorable to him, e.g., that the victim's group "challenged" defendant and may have called him a derogatory name, that defendant initially backed away from the rivals, and that defendant drew his gun after the victim reached for a gun and said he was going to "blast" defendant. Defendant notes this evidence came from the prosecution's own witnesses.

However, there was also evidence that the victim did not reach for a gun, and that defendant initiated the violence by being the first to pull out a gun. There was substantial evidence to support a conclusion that defendant intended to confront and kill a member of a rival gang when he came upon one and initiated the contact with the rival group at the AM/PM. There was evidence that, earlier on the day of the shooting, defendant emptied the bullets out of a gun, wiped them clean, and then reloaded the gun wearing a glove. Later in the day but still before the shooting, defendant made comments that he was going to "peel someone's cap back" and would shoot a "scrap" (rival Sureño gang member) if he saw one. Contrary to defendant's argument on appeal, it does not matter that there were no Sureños in sight when defendant made these statements, nor does it matter if (as defendant contends) he came upon the Sureños by "pure chance."

Additionally, there was evidence that defendant and his companion initiated the encounter by "muggin," or staring in a disrespectful, negative or challenging way, and defendant

accepted the other group's challenge by saying he was from
Franklin.  There was also evidence that the victim never moved
his arm to pull out his gun, which the medics found, unused, in
the victim's pocket.  Thus, there was evidence that defendant
was the first to show a gun.  Defendant also bragged after the
shooting and commented that if he was going to go to prison, he
was going to go to prison for something that was worth it.  In a
pretrial interview, one of the victim's companions told a police
detective that defendant and his friends initiated the contact
by "muggin," i.e., by staring in a negative or challenging
manner.  Although the victim had a gun, the medics found it--
unused--in his left front pants pocket, and the victim's friend
testified the victim did not make a move to pull his gun before
he was shot.

    Thus, there was substantial evidence that defendant
initiated the confrontation with the intent of creating the
necessity of exercising self-defense, or that he engaged in
mutual combat.  Even assuming his actions before pulling his gun
did not amount to assault, the jury was instructed, "Whether
some instructions apply will depend upon what you find to be the
facts.  Disregard any instruction which applies to facts
determined by you not to exist."  Even assuming the instruction
referencing assault should have been excluded, the instructions
concerning mutual combat and seeking a quarrel were clearly
supported by the evidence.  Even under defendant's proposed

*Chapman* standard (which we do not endorse in this context), he fails to show reversible error.

Defendant fails to show any grounds for reversal based on instructional error.

V.    Substantial Evidence

Defendant argues that, based on the record as a whole, and as a matter of law, he is not guilty of first degree murder; at most, he is guilty of voluntary manslaughter based on imperfect self-defense or heat of passion. Defendant's opening brief does not directly challenge the sufficiency of the evidence regarding premeditation and deliberation, but instead claims he is (1) entitled to acquittal because he established reasonable self-defense, or (2) guilty only of voluntary manslaughter because he was provoked or acted in the unreasonable belief that he needed to kill the victim before he was killed. We disagree.

To determine sufficiency of the evidence, we review the record in the light most favorable to the judgment to determine whether the record contains evidence that is reasonable, credible, and of solid value, from which a trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Carter, supra*, 36 Cal.4th at p. 1156.)

In upholding a first degree murder conviction where a stray bullet during a shootout between rival gang members killed a bystander, the California Supreme Court said in *People v. Sanchez* (2001) 26 Cal.4th 834, that the evidence supported a

finding that the defendant premeditated the murder of his rival. (*Id.* at p. 849.)  "'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'  [Citation.] Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief.  [Citation.]  A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation."  (*Ibid.*)  "Although the actual shooting here may have been almost spontaneous, the mutual planning of one another's murder supports a finding of premeditation as to both defendant and [his rival]."  (*Id.* at p. 850.)

Defendant argues his case is different from *Sanchez* and its cited authority because he did not go looking for rival gang members but came upon them by pure chance, and *Sanchez, supra,* 26 Cal.4th 834, involved transferred intent.  These distinctions do not help defendant's case.  *Sanchez* said the jury could reasonably have found that "at least as of the time the first shots rang out," the defendant and his rival had armed themselves and premeditated and deliberated attempted murder of each other.  (*Id.* at p. 849.)

The evidence we recounted in the previous portion of this opinion supports the first degree murder conviction.

In this section of his appellate brief arguing insufficiency of the evidence of murder, defendant mainly ignores the evidence supporting the judgment and describes the evidence he feels supports his self-defense theory. He thus ignores the proper standard of review, by which we review the record in the light most favorable to the judgment. (*People v. Carter, supra*, 36 Cal.4th at p. 1157.)

Defendant says the gang expert and Sandra Steffens testified that when Ivan Garcia and the victim called defendant derogatory names and asked where he was from, defendant had the choice to walk away or fight, but if he walked away, he could face retaliation and recrimination from his own gang. Defendant then acknowledges the evidence that, before the shooting, he said he was going to kill a "scrap" or "peel someone's cap back," but defendant suggests the gang expert said this is what all gang members say -- it is "puffing" or bragging. Defendant then says none of these people knew one another or expected to see each other at the AM/PM. Defendant then argues: "Only by adopting the prosecutor's argument that there is no 'reasonable gang member' standard could the jury conclude that [defendant] is guilty of first degree murder. The 'pre-offense statements' were made hours earlier and according to the gang expert were part of the bragging and puffing that all gang members do --.

30.

Sureños, too.  Cabrera said he always carried a gun with him on the weekends 'for protection.'  Chupas [the victim] was armed.  [Defendant] did not go looking for this fight.  He was on his way home, briefly stopping to buy cigarettes.  There was no evidence that he anticipated that Sureños would show up and, in any case, it is doubtful he would have picked these circumstances -- being outnumbered and not expecting the confrontation -- to carry out his 'plan.'"

Defendant's argument lacks merit.  First, he misrepresents the expert's testimony.  The cited page of the record shows the expert, when asked about the meaning of talk about blasting someone or shooting scraps, the expert said, "Shows this is what he's about.  This is what he wants to do, which in my opinion looks like he's looking forward to that.  That these guys, Sureños, these scraps, these sewer rats are his enemy, and so if he, if this is what he wants to do, that opportunity, he's going to take that opportunity."  Thus, contrary to defendant's spin, the expert did not dismiss the comments as mere braggadocio.  Moreover, it does not matter if, as defendant claims, he did not know the rivals would be at the AM/PM that night.  There was evidence that defendant's group and the rival group recognized each other as rivals when they saw each other.

There was substantial evidence for the jury to conclude defendant did not act in self-defense.

To the extent that defendant suggests he was provoked into shooting the victim, he fails to show grounds for reversal. Generally, an intent to kill unlawfully reflects malice. (*People v. Lee* (1999) 20 Cal.4th 47, 59, citing § 188.) In some circumstances, a finding of malice may be precluded and the offense limited to manslaughter, even when the homicide was committed with the intent to kill. (*Ibid.*) The malice inherent in an intentional unlawful killing is negated only when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)) or in the actual but unreasonable belief in the need for self-defense. (*People v. Lee, supra,* 20 Cal.4th at p. 59.) For voluntary manslaughter, provocation *and* heat of passion must be affirmatively demonstrated. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The defendant must subjectively kill under the heat of passion, but the circumstances giving rise to the heat of passion are viewed objectively. (*Ibid.*) Such provocation or heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, because no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believes that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. (*Id.* at pp. 1252-1253.)

Defendant cites evidence that the victim may have called defendant a provocative, derogatory name ("buster" or "chapete," which are derogatory terms for a Norteño), and the rivals' bearing reflected preparation for a fight, and rival Ivan Garcia told the police that defendant looked agitated and panicked. This is not adequate provocation.

We reject defendant's argument that the evidence amounted to no more than voluntary manslaughter as a matter of law.

Substantial evidence supports the judgment.

VI. <u>Probation Revocation</u>

Defendant argues that, if he is successful in reversing the judgment on the murder conviction, then the factual basis for the trial court finding defendant in violation of probation on his earlier case (No. 03F02411) will no longer exist, and we should set aside the probation revocation ordered by the trial court. However, defendant is not successful in his appeal from the judgment on the murder conviction, and therefore the probation revocation stands.

DISPOSITION

The superior court shall modify the judgment (1) changing "667(e)(2)" to "667(e)(1)," and (2) adding the 15-year minimum parole eligibility date pursuant to Penal Code section 186.22, subdivision (b)(5). The clerk of the superior court shall forward a certified copy of the amended abstract of judgment to

33

the Department of Corrections and Rehabilitation.   The judgment
is otherwise affirmed.


                                   _____SIMS_____, J.


We concur:


_____BLEASE_____, Acting P.J.


_____NICHOLSON_____, J.


RECEIVED
NOV 2 8 2006
BY:------------------

34

Legal Mail
CONFIDENTIAL

KERN VALLEY STATE PRISON
A S U South # 1 Cell 137
P.O. Box 5107
DELANO, CA 93216

RECEIVED

FEB 1 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

U.S. District Court
Northern District
450 Golden Gate Avenue
P.O. Box 36060
SAN FRANCISCO, CA
94102



$ 02.67 0
02 1A
0004064192 FEB 08 2008
MAILED FROM ZIP CODE 93215
UNITED STATES POSTAL SERVICE